UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LARRY L. WILSON,

          Plaintiff,

    v.                               Case No.: 2:14–CV–428
                                       JUDGE SMITH
                                       Magistrate Judge Jolson

MEGAN J. BRENNAN, Postmaster General
United States Postal Service,

          Defendant.

## OPINION AND ORDER

This matter is before the Court upon the Motion for Summary Judgment of Defendant Megan Brennan, United States Postmaster General (Doc. 45). Plaintiff Larry Wilson filed a Response in Opposition (Doc. 48) to which Defendant replied (Doc. 52). The issues before the Court are fully briefed and ripe for review. For the reasons that follow, Defendant's motion is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This lawsuit arises out of the former employment relationship between Plaintiff Larry Wilson ("Plaintiff" or "Wilson") and the United States Postal Service, led by then Postmaster General Patrick Donahue and now led by Megan Brennan (collectively, "USPS"). Plaintiff is a sixty-nine-year-old, African-American male who worked for the USPS from November 1969 until his retirement in 2014. (*See* Doc. 13, Am. Compl. at ¶ 8). Wilson worked at the CityGate Postal Facility ("CityGate") in Columbus, Ohio during all relevant times in this lawsuit. (*Id.*). This action also involves several key USPS employees. Chris Smith was the Plant Manager at CityGate and Plaintiff's direct supervisor from 2009 to 2014. Valerie Roush was the Manager of

In-Plant Support and made two hiring decisions challenged by Wilson.  Finally, Tina Craft is a USPS employee who was also involved in two hiring decisions challenged by Wilson.

The CityGate facility has three shifts each day: Tour 1 acts as the night shift; Tour 2 is the day shift; and Tour 3 is the evening shift.  (Doc. 13, Am. Compl. at ¶ 7).  For the majority of the years at issue in this lawsuit, Wilson was stationed in Tour 3 as a Manager of Distribution Operations ("MDO").  (*Id.* at ¶ 8).  Aside from a brief interruption—the existence of which is a point of contention in this lawsuit—Tour 3 was staffed by one Lead MDO and fifteen regular MDOs from 1995 to 2014.  (*Id.* at ¶ 10).  In 2007, before the facts giving rise to this case began, Plaintiff filed a separate lawsuit against USPS.  That lawsuit alleged race, gender, and retaliatory discrimination in connection with Plaintiff's attempt to be promoted to Tour 2 Lead MDO with a salary at Executive and Administrative Schedule ("EAS") level 24.[1]  *Wilson v. Potter*, No. 2:07-CV-1118 (S.D. Ohio 2007) (Holschuh, J.).  Wilson dismissed the case after the Court granted in part USPS's Motion for Summary Judgment.  *Id.* at Doc. No. 31, Doc. 35.

The facts pertinent to the present lawsuit began in February 2009 while Plaintiff's first lawsuit against USPS was still pending and Plaintiff served as a Tour 3 MDO.  (Doc. 13, Am. Compl. at ¶ 15).  In February 2009, Smith was detailed to CityGate to act as the Plant Manager.  (*Id.* at ¶ 16; Doc. 49-1, Smith Detail Assignment).[2]  Upon Smith's arrival at CityGate, Wilson informed Smith of the pending lawsuit and testified that Smith had a role in the federal lawsuit.  (Doc. 49-30, Wilson Dep. at 45).

At that time, the Lead MDO for Tour 3 received an EAS 24 salary and the position was held by Charles Brown, an African American male over the age of 40.  (Doc. 13, Am. Compl. at

---

[1] Both Plaintiff and Defendant use the USPS terminology for these positions which consists of the Tour, the title of the position, and the EAS level of salary; i.e. a Lead Manager of Distribution Operations on Tour 3 receiving an EAS level 24 salary is termed the "Lead MDO EAS 24."

[2] A "detail" at USPS is a temporary assignment.  (Doc. 49-31, Smith Dep. at 35).

¶ 16).  On March 1, 2009, Brown retired from USPS and Plaintiff allegedly had interest in assuming Brown's former role, which would include a pay raise and more responsibility.[3]  (*Id.*).  Smith noted that CityGate was doing "poorly on service performance" and decided to detail Jeffery Dawson, a Cincinnati USPS office employee into Brown's vacated EAS 24 spot.  (Doc. 49-31, Smith Dep. at 64).  Dawson, an EAS 23 at the time, had no experience with the Columbus office and allegedly had the majority of his experience in maintenance.  (Doc. 49-30, Wilson Dep. at 27–28).  It is not clear on what date Smith chose to detail Dawson into the EAS 24 position but he testified that at the time he arrived at CityGate, "there was still a[n EAS] 24 of record," but that a reorganization occurred a few months later which eliminated the EAS 24.  (Doc. 49-31, Smith Dep. at 44).  Ultimately Dawson was given an EAS 24 salary and worked in the position until July 2009.  (*See* Doc. 49-8, Dawson Clock Rings at PAGEID #1320).

USPS alleges that Brown's permanent position was eliminated in March 2009 as part of the aforementioned national structural reorganization.  In an "Impact Employee Briefing" on March 24, 2009, the "Impacted Summary" for MDOs shows that while there were two MDO EAS 24s at the time of Brown's retirement, the new allocation was for one MDO EAS 24 and two MDO EAS 22s.  (Doc. 49-9, Impacted Employee Briefing at PAGEID# 1329).  Plaintiff alleges that the elimination of an MDO, EAS 24 was made at the district level by Smith and approved at the national level based on Section 354.221 of the Employee Relation Manual.  (Doc. 49-30, Wilson Dep. at 36–38).  Smith testified that "there was a reorg[anization] structurally that I had no control over."  (Doc. 49-31, Smith Dep. at 44).  This reorganization resulted in the removal of an EAS 24 and the elevation of two EAS 20s to EAS 22s.  (*Id.*).

---

[3] Although Plaintiff's Memorandum states "Plaintiff made his interest in the position known to postal service management," there is no citation to any evidence in the record for that assertion.  (Doc. 48, Pl.'s Mem. Opp. at 2).  Further, he later notes, "The postal service was well aware that Plaintiff would express an interest in the Tour 3 position . . . ."  (*Id.*).

Regardless of who eliminated the EAS 24 position desired by Plaintiff, consistent with the restructuring, USPS then posted a job opening for the MDO EAS 22 position.  (Doc. 49-30, Wilson Dep. at 40).  Plaintiff applied for the open MDO EAS 22 position and was competitively selected over three other candidates, including both Caucasian and African American candidates. (Doc. 49-30, Wilson Dep. at 41–43).  On December 17, 2009, Plaintiff filed an EEO discrimination charge regarding the Smith's detailing of Dawson to the Tour 3 Lead MDO EAS 24 position, the elimination of that same position, and regarding his work as a Lead MDO while being paid EAS 22 salary.  (Doc. 13-1, First Charge).

In September 2009, Smith sent out a memorandum regarding how the MDOs at CityGate would report to their superiors.  (Doc. 49-17, Smith Sept. 18, 2009 E-mail to Staff).  Smith assigned Angie Strathie to the Senior Manager position for CityGate and designated Wilson as the Tour 3 Lead MDO but without raising his pay to the EAS-24 level.  (*Id.*).  Apparently, this increase in responsibility meant that Wilson was in a detailed position rather than a permanent MDO position.  Over a year later, Smith sent Wilson an email telling him that he was not on a detail and that Wilson could move back to be "the 22 MDO," which would have constituted a demotion in duties but not pay.  (Doc. 49-22, Smith Nov. 3, 2010 E-mail to Wilson).

The employment relationship was comparatively uneventful until July 2012 when Smith required Wilson to make a change in his shift.  On July 25, 2012, Smith emailed Wilson and stated, "[w]ith the retirement of Jocelyn and Sandy I want you to start coming in at 10am to run the floor and end tour at 630pm.  If this doesn't work, then Ray [Roush] will be going to that schedule and you will report to Angie [Strathie] on [Tour 1] and replace Ray.  I wanted to give you the options first.  Let me know which schedule works for you."  (Doc. 49-27, Smith and Wilson July 2012 emails).  Wilson responded:

4

> I've been on Tour 1 before and left because of Medical reasons relating to my inability to work the night shift which caused me to be hospitalized for 2 weeks. The record I have reflects 7 years of being denied employment on Tour 2 which is well documented from previous EEO's and depositions and letters to you, which will also be brought forth to support why I now have no desire to work Tour 2 at this late date of my career. Hopefully you'll reconsider your intentions in this matter.....I've paid more than my dues....and I believe it's time for the Postal service to acknowledge and respect and compensate me for that.

(*Id.*). Smith responded that "the Agency is very fluid right now and work schedules will change for everyone. As the MDO your work schedule may change from time to time like anyone else. This is one of those occasions. With T1 coming in at 830-9pm I am expecting all of your managers to expect a change in schedule." (*Id.*). Smith testified that he wanted Wilson to work earlier because three supervisors had retired, he needed a stopgap, and that a portion of the Tour 3 workers had moved to earlier times and needed supervision. (Doc. 49-31, Smith Dep. at 20–21). Ultimately, Plaintiff made the change to an earlier start schedule and retained the pay differential that he normally received for working the evening shift. (*Id.* at 24). Wilson admits that he was interested in working on Tour 2 as an EAS 24 as he alleged in the prior lawsuit but did not want to work on Tour 2 as an EAS 22. (Doc. 48, Pl.'s Mem. Opp. at 14). Plaintiff filed an EEOC complaint on December 21, 2012, regarding the schedule change. (Doc. 10-5, Second Charge).

In October 2013, the Tour 3 Lead MDO EAS 24 became available for the first time since Brown's retirement in 2009. Plaintiff alleges that in a November 2013 meeting with Smith, Valerie Roush, and Tina Craft, Smith told Wilson that USPS was going to detail Valerie Raynes, a USPS employee from another facility, to Plaintiff's position. (Doc. 49-30, Wilson Dep. at 136). After being told he would return to the job he held when Brown was still with USPS, Wilson told Tina Craft to shut up, told Smith he was the devil, and left the room. (*Id.* at 137).

Ultimately, USPS did not detail Ms. Raynes into Plaintiff's position and Plaintiff remained in his current role and pay grade. (*Id.* at 141).

Valerie Roush and Tina Craft, the members of the interview panel for the Tour 3 MDO EAS 24 position, chose to interview three applicants: Wilson, John DePaul and Paula Williams. (Doc. 49-32, V. Roush Dep. at 33, 37). Mrs. Roush testified that she interviewed all three because they were all she had. (*Id.*). Two other applicants, Charlotte Carter and Adrana Williams submitted applications but were "not eligible to apply" for various reasons and thus, were not interviewed or considered. (*Id.* at 38–40). After interviewing all three candidates, Roush and Craft determined that none of the applicants should receive the job. Mr. DePaul, a white male over the age of 40, interviewed well but lacked hands-on experience, while Ms. Williams would have had too much of a learning curve for some of the job responsibilities. (*Id.* at 34–35). Wilson was not selected because he did not interview well. (*Id.*). Specifically, Mrs. Roush stated that Wilson could not give specific answers during the interview. (*Id.*). As an example, she recalled that he could not give examples of how to motivate people. (*Id.*). Mrs. Roush decided to re-open the position and cast a wider net for applicants. (*Id.*).

Before the job was reposted, Mrs. Roush came to Plaintiff and told him that it would be reposted. She told Wilson that he needed "to tighten up his 991." (Doc. 49-30, Wilson Dep. at 67–68). A 991 was the form number for an application and Plaintiff believes that this comment was Mrs. Roush's acknowledgement that Mr. Smith did not want to give Plaintiff the job. (*Id.* at 69). Mrs. Roush believes she probably told Plaintiff the job was re-opening but does not recall telling him to tighten up his 991. (Doc. 49-32, V. Roush Dep. at 44).

Mrs. Roush and Wilson had an incident on December 20, 2013, regarding the holiday schedule. Mrs. Roush testified that Larry Kennedy (or Canady), an American Postal Workers

Union representative, came to her and said that there were issues with the holiday schedule created by Wilson.  (Doc. 49-32, V. Roush Dep. at 46–48).  Mrs. Roush approached Wilson and told him that something was wrong with the holiday schedule.  (Doc. 49-30, Wilson Dep. at 87–88).  Wilson alleges that he had already cleared the schedule with Kennedy when this conversation occurred.  (*Id.* at 91).  Wilson then went to Kennedy who told Wilson that he "went to Valerie's office and told her that Tour 3 had drafted some employees that did not want to work on the holiday, and that Tour 1 had some employees that did not want to work that wasn't given the opportunity to work . . . could you and the plant manager or someone . . . see if Larry would let some of those people off that he drafted and could go back to Tour 1 and . . . ask them if they would like to come to Tour 3 . . . ."  (*Id.* at 94–95).  Wilson alleges that he relayed Kennedy's statement to Mrs. Roush and that she responded by yelling at him.  (*Id.* at 95.)  Wilson then told her, "I guess that's why you didn't give me that [EAS 24] job."  (*Id.*).  Roush "went into an uproar and started hollering and screaming at [Wilson]."  (*Id.*).  Mrs. Roush testified that Wilson was loud and told Mrs. Roush that she was harassing Wilson, just like Smith.  (Doc. 49-32, V. Roush Dep. at 47).  Mrs. Roush asked Plaintiff to go home "because of the loudness, the rudeness."  (*Id.*).  When he did not leave, Craft and a maintenance employee escorted Wilson out although Mrs. Roush admits Wilson may have already been in the process of departing.  (Doc. 49-32, V. Roush Dep. at 73; Doc. 49-33, Craft Dep. at 30).  Mrs. Roush also issued Wilson a Performance Improvement Plan ("PIP") on January 16, 2014, based on his reaction to the holiday schedule situation.  (Doc. 49-32, V. Roush Dep. at Ex. 7, PAGEID# 1759–61).  The PIP stated that Wilson had issues with conducting himself "in a professional manner" and communicating "effectively with peers, superiors, and cross functionally."  (*Id.*).  The PIP required Wilson to perform courses on communication, delegation, and leadership skills.  (*Id.*).

Four days after the holiday schedule incident, the Tour 3 MDO EAS 24 position was again posted for applications.  (Doc. 49-32, V. Roush Dep. at 49).  For the second posting, Mrs. Roush received seven applicants: Wilson, DePaul, Roosevelt Thompson, Mrs. Williams again, Alan Metzcar, JR Hissett, and Juan Carlos Zamudio.  (*Id.* at Ex. 6, PAGEID# 1705).  This time, there is no evidence that any of the candidates were removed from consideration during a prescreening process.  Rather, Mrs. Roush and Craft used a scoring matrix to determine which candidates should receive interviews.[4]  (*Id.* at 28).  Because of the large disparity between the matrix score of the second highest applicant and the matrix score of the third highest applicant, Mrs. Roush chose to interview only the top two candidates, DePaul and Zamudio.  (*Id.* at 37, 53, 55).  Wilson did not score within the top five of the applicants, but Mrs. Roush does not remember why his score was so low.  (*Id.*).  Ms. Craft also does not remember how Wilson scored on the matrix but noted that the application process was much more competitive.  (Doc. 49-33, Craft Dep. at 34–35).  In a conversation between Smith and Wilson around the time of Wilson's retirement, Smith directly denied that he had anything to do with Plaintiff not receiving an interview.  (Doc. 49-30, Wilson Dep. at 72).  After interviews with both DePaul and Zamudio, Mrs. Roush and Craft selected DePaul and recommended him to Smith for final approval.  (Doc. 49-32, V. Roush Dep. at 55).  USPS announced DePaul's hiring on January 30, 2014, effective February 8, 2014.  (Doc. 49-38, DePaul Announcement).  Plaintiff retired shortly thereafter.

Plaintiff filed suit in this case having filed two EEOC complaints regarding his non-promotions in 2009 and beyond.  In order to make its analysis more efficient, the Court has

---

[4] Scores were calculated using the following method: "Well, basically, you have the . . . seven skill sets listed in the application that the applicant has to respond to.  And we rate each one either using zero or three . . . that they don't demonstrate their skill set, up to three being the highest. And we just rate each applicant across for each of the skill sets. And then at the end of the -- each applicant's rating, we add them up and they have a total score."  (Doc. 49-33, Craft Dep. at 23–24).

numbered the alleged adverse employment actions in the Amended Complaint and will use that numbering throughout. Wilson makes retaliation, age, and race discrimination claims for all of the following: (1) "filling the Tour 3 Lead MDO position with a lesser-qualified individual;" (2) "paying Plaintiff lesser pay for performing similar work in the Tour 3 MDO position;" (3) "refusing to post vacancies in the Tour 3 Lead MDO position and Senior MDO position and allow Plaintiff to competitively bid upon those positions;" (4) "refusing to promote Plaintiff to the Tour 3 Lead MDO position and Senior MDO position;" (5) forcing "Plaintiff (working on Tour 3 at the time) to accept an assignment on Tour 2 but refused to pay him higher level pay in that position;" (6) "refusing to promote him in approximately December 2013;" and (7) denying "him the promotion to EAS 24 Tour 3 Manager of Distribution Operations and plac[ing] him on an unwarranted performance improvement plan to prevent him from interviewing for the position in approximately January 2014." (Doc. 13, Am. Compl. at ¶¶ 52, 54, 58, 60, 62). He also brings a gender discrimination claim for the Lead MDO position in Claims 3 and 4, for Claim 6, and for an eighth claim: (8) "choosing to impact Plaintiff with the Reduction In Force ["RIF"] Avoidance procedure while choosing not to impact similarly situated females on other tours by that same procedure." (*Id.* at ¶ 56).

## II.    STANDARD OF REVIEW

Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A

genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

### III. DISCUSSION

Defendant generally argues that Plaintiff cannot provide evidence supporting a *prima facie* case of discrimination for any of these incidents or that there were legitimate, non-discriminatory reasons for the claimed adverse action. Plaintiff opposes Defendant's Motion on factual and legal grounds which will be discussed further below.

### 1. Race, Age, and Retaliation Claims Related to the Detail Filling of the Tour 3 Lead MDO EAS 24 Position

USPS does not make any substantive argument on this claim, but rather, seemingly addressed this claim while discussing Claims 2, 3, and 4. Claims of race, age, and retaliatory

discrimination use the *McDonnell Douglas* burden shifting framework for cases such as this where there is no direct evidence of discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972)); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).  It is Plaintiff's burden "to establish a *prima facie* case of discrimination." *Id.*  If Plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the Defendant to "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas*, 411 U.S. at 802.  If Defendant articulates such a reason, "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant . . . were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas*, 411 U.S. at 804.)

In order to establish a *prima facie* case for race discrimination through failure to promote, a plaintiff must show (1) he is a member of a protected class; (2) he applied for and was qualified for promotion; (3) he was considered for and denied the promotion; and (4) an individual of similar qualifications outside of the protected class received the job. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006); *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005).  For the ADEA claim, the *prima facie* case consists of: (1) membership in the protected class (between the ages of 40 and 70); (2) that he applied for and was qualified for a promotion; (3) despite his qualifications, he was rejected for promotion; and (4) that a similarly situated younger person was hired instead." *Hines v. Ohio State Univ.*, 3 F. Supp. 2d 859, 874 (S.D. Ohio 1998) (Marbley, J.) (citing *Carpenter v. W. Credit Union*, 62 F.3d 143, 144 (6th Cir. 1995); *Mitchell*, 964 F.2d at 582–83).  The *prima facie* case for a Title VII retaliation claim consists of four elements:

> (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citing *Garner v. Cuyahoga Cty. Juvenile Ct.*, 554 F.3d 624, 639 (6th Cir. 2009)).

While USPS moved for summary judgment as to all of the claims in the Amended Complaint, there is no argument in the Motion which addresses the selection of Dawson for the EAS 24 detail assignment rather than Wilson. Although USPS asserts that the detailing of Dawson "is not the subject of this complaint," the Court finds that such a conclusion is not appropriate. (Doc. 52, Reply at 3). The Amended Complaint specifically states that "Smith chose to fill the position of Lead MDO Tour 3, EAS 24, with an individual who did not work at the CityGate facility, Jeffrey Dawson, white male." (Doc. 13, Am. Compl. at ¶ 17). Further, it goes on to state, "[t]he defendant, through its officials, intentionally discriminated against the plaintiff because of his race . . . by filling the Tour 3 Lead MDO position with a lesser-qualified individual." (*Id.* at ¶ 54). Accordingly, the Court finds that the detailing of Dawson is one of the subjects of the Complaint,

However, this claim can be analyzed without deciding whether Plaintiff made out a prima facie case regarding the detailing of Dawson, USPS provides an argument that Dawson was placed in the detail position for legitimate, non-discriminatory reasons. USPS alleges that "numerous service indicators were below benchmark and he wanted an outside person with a proven track record to help facilitate change." (Doc. 52, Reply at 4). Because USPS has set out a legitimate non-discriminatory reason for Dawson's detail, it is Plaintiff's burden to show pretext. "A plaintiff can make this showing in one of three ways: (1) by showing that the

proffered reason had no basis in fact; (2) by showing that the proffered reason did not actually motivate the employer's conduct[;] or (3) by showing that the proffered reason was insufficient to warrant the challenged conduct." *White*, 429 F.3d at 245 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)).

It appears that Plaintiff is attempting to argue that the proffered reason did not actually motivate the employer's conduct because Plaintiff does not directly dispute Smith's assertion that service indicators were below benchmark, that Dawson had a proven track record, or that an outsider would better facilitate change.  Instead, Plaintiff argues that he was the most qualified person in the United States for the position because he had 38 years of experience on Tour 3, 20 years of managerial experience, and had filled in as the Tour 3 Lead MDO, EAS 24 when Brown was not working.  Dawson had some experience on processing operations but was primarily a maintenance employee.  Plaintiff also argues that Smith lied about Dawson's pay rate when Wilson asked if Dawson would be paid as an EAS 24 while detailed as the Tour 3 Lead MDO. Ultimately, while Wilson may have been more qualified than Dawson and Smith may have been dishonest about Dawson's pay, Plaintiff has not provided any evidence which refutes the reasons given by Smith in his deposition or evidence showing that the proffered reasons did not actually motivate Smith's conduct.  Accordingly, summary judgment is **GRANTED** in favor of the USPS on all of the claims relating to the detailing of Dawson to the EAS 24 position.

**2.      Race, Age, and Retaliation Claims Related to the Removal of the Tour 3 Lead MDO EAS 24 Position**

USPS next moves for summary judgment on Plaintiff's race, age, and retaliation claims concerning the alleged restructuring and removal of the Tour 3 Lead MDO EAS 24 position and Plaintiff's promotion to EAS 22 while he had to perform EAS 24 duties.  USPS alleges that the *prima facie* case cannot be met here because there was no adverse action because the Tour 3

Lead MDO EAS 24 position was removed as part of a national restructuring meaning there was no job to apply for and, accordingly, no adverse action. Plaintiff argues that "Smith rebuffed every inquiry from Wilson about the position with false statements in order to keep Wilson at bay concerning the position," and that "the postal service was attempting to hide the position from Wilson and prevent him from applying for it/pursuing it." (Doc. 48, Pl.'s Resp. at 26–27). Further, although Wilson was promoted to EAS 22, he continued to do the duties of the Tour 3 Lead MDO EAS 24 without receiving the pay that accompanied that position. (Doc. 49-10, 2010 Organizational Chart).

Although USPS repeatedly claims that the position was eliminated as part of a national restructuring, USPS's argument that there was no adverse action is a non-starter. Wilson alleges that he made his interest in the position known and that it was eliminated before he could apply to it, but after he had already made his interest known.[5] (Doc. 49-6, Wilson EEOC Aff. at ¶ 5). At least two other courts have found similar circumstances sufficient to find an adverse employment action. *Darden v. Town of Stratford*, 420 F. Supp. 2d 36, 43 (D. Conn. 2006) ("Thus, an indirect result of the restructuring was that plaintiff was denied a promotion she anticipated she would receive."); *Feder v. Bristol-Myers Squibb Co.*, 33 F. Supp. 2d 319, 325 (S.D.N.Y. 1999) ("In order to give determinative effect to the elimination of the position, one necessarily must conclude that the organizational change was made for bona fide, non-discriminatory reasons."). Accordingly, USPS's argument "inappropriately would put the cart before the horse by collapsing the determination of the merits of the claim of discrimination into the determination whether the plaintiff has made out a *prima facie* case." *Feder*, 33 F. Supp. 2d

---

[5] Plaintiff's affidavit with the EEOC notes that he was informed in March the position was being eliminated but also alleges that the position remained open and vacant until July 31, 2009.

at 325.  The Court finds that the elimination of the EAS 24 position is an adverse employment action.

USPS also alleges that Wilson was not treated differently than similarly situated persons but instead of discussing other persons who aspired to promotions for Tour 3 Lead MDO EAS 24 positions, USPS instead notes that Plaintiff received a promotion to EAS 22 over other applicants.  But the Court finds that a similarly situated person was treated differently.  When the position was eliminated, Dawson was acting as the Tour 3 Lead MDO EAS 24.  Although USPS argues he was just finishing out his time on his detail, the uncontested facts are that after the position was eliminated, Dawson continued to work in the Tour 3 Lead MDO EAS 24 position for two to three months.  USPS argues that "Mr. Dawson is not similarly situated because he was not in the position permanently but was on a detail . . . ."  (Doc. 45, Mot. at 27).  Yet, USPS continued to employ a person in the position sought by Plaintiff after telling him that the position had been eliminated and paid that employee an EAS 24 salary while only paying Plaintiff EAS 22 salary when he later performed the same job.  Accordingly, Plaintiff has set forth a *prima facie* case of race and gender discrimination regarding the removal of the Tour 3 Lead MDO EAS 24 position in 2009 and his payment as an EAS 22 while performing the duties of an EAS 24 based on circumstantial evidence.

Plaintiff argues that the fourth element of the retaliation claim—that there is a causal connection between the protected activity and the adverse employment action or harassment—is apparent because of USPS's pattern of conduct that Plaintiff alleged in his 2007 lawsuit against USPS.  Further, the alleged adverse action in this case occurred in 2009, while the previous lawsuit was still ongoing.  This demonstrates a strong temporal connection between the adverse action and the protected activity.  Although [t]emporal proximity alone cannot establish a causal

connection, . . . temporal proximity always plays a role in establishing a causal connection . . . ." *Fuhr*, 710 F.3d at 675 (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010)). Further, when temporal proximity is combined with other factors, such as when the plaintiff can "show[ ] that he was treated differently from other employees," is sufficient evidence of retaliatory conduct to establish a causal connection. *Spengler*, 615 F.3d at 494 (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007)). Accordingly, the Court finds Plaintiff has sufficiently established his *prima facie* case of retaliatory discrimination.

However, the Court must now consider the remaining elements of the *McDonnell Douglas* burden shifting framework. Although the evidence is scant, USPS has proffered a legitimate non-discriminatory reason for the elimination of the position: USPS had a national restructuring which eliminated the position before Plaintiff could apply and therefore they could not pay him EAS 24 salary when he performed the Tour 3 Lead MDO EAS 24 responsibilities. Specifically, Smith testified that the restructuring happened over his head and that he had no control over it. (Doc. 49-31, Smith Dep. at 44).

Plaintiff, however, challenges the truth of the proffered reason based on numerous factual assertions. Plaintiff's evidence that the proffered reason is pretext is based on the following assertions: (1) that the plant manager is in charge of making such changes under USPS policy (Doc. 49-5, Wilson 2010 EEOC Aff. at Attach. C, PAGEID# 1279–80); (2) that Dawson continued to work in the position after it was eliminated (Doc. 49-8, Dawson Clock Rings; Doc. 49-30, Wilson Dep. at 46–47); (3) that Dawson told Wilson that Dawson would be back when the position was re-opened (Doc. 3, Wilson 2009 Ltr. to Smith at 1); (4) that USPS has produced no documentation approving the staffing restructure when USPS was able to do so in the past

(Doc. 49-10, Jeff Bergen 2001 Ltr. to Wayne Eggiman re: Staffing Changes; Doc. 49-11, Gery McCurdy 2001 Ltr. to Bergen Approving Staffing Changes); (5) that Smith was dishonest about Dawson's pay (Doc. 49-30, Wilson Dep. at 28); (6) that the position appeared as "vacant" on the USPS website as late as 2010 (Doc. 49-26, Website Manager Listing); and (7) that USPS RIF Avoidance plan resulted in paying more people higher salaries (Doc. 49-5, Wilson 2010 EEOC Aff. at Attach. C, PAGEID# 1280–82).

USPS disputes Plaintiff's first assertion but fails to offer any evidence or argument that seriously challenges the validity of the remaining assertions.  USPS asserts that "the mere fact that Dawson was brought in on a detail as a Level 24 does not make suspect that national headquarters elimination of the Level 24 position . . . ."  (Doc. 52, Reply at 4).  But a reasonable jury could easily reach the opposite conclusion—that USPS continuing to pay an employee in a position which was eliminated is evidence that the position was never really eliminated in the first place.  USPS does not deny that Smith was dishonest about Dawson's pay, that Dawson told employees he planned to return once the job was re-opened, that there is no documentation showing a national restructuring, that the position was listed on the website as vacant, and that the RIF avoidance plan resulted in higher pay to the managers.  The Court finds that these inconsistencies in USPS' explanation—specifically, the complete lack of any documentation showing that a national restructuring may be sufficiently significant evidence—would allow a reasonable jury to find that the proffered reason was pretext for discrimination.  When combined with Wilson's other uncontested arguments, there is little doubt that summary judgment is improper for these claims.  Accordingly, summary judgment as to Plaintiff's Claims 2 and 3 is **DENIED**.

**3.     Race, Age, Gender, and Retaliation Claims Related to the Refusal to Post Vacancies, Failure to Promote Plaintiff to the Tour 3 Lead MDO Position and the Senior MDO Position, and Gender Discrimination Claims Concerning RIF Avoidance**

Although USPS moved for summary judgment on all of Plaintiff's claims, the Motion did not address the gender discrimination aspect of Claim three or any of the discrimination alleged for Claim 4 outside of the arguments presented in the preceding section.  Similarly, the Motion did not address Plaintiff's gender discrimination claims regarding RIF avoidance procedures under Claim 8.  At this stage, Defendant, as the moving party, bears the burden of informing the Court that there is no genuine issue of material fact.  *E.E.O.C. v. Cintas Corp.*, No. 04-40132, 2010 WL 3565830, at *4 (E.D. Mich. Sept. 9, 2010) ("The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which demonstrate the absence of a genuine issue of material fact." (citing *Celotex*, 477 U.S. at 323)).  Because Defendant has made no effort to inform the Court of the basis for its motion on Claim 3, Claim 4, or Claim 8, summary judgment on Claim 3, Claim 4, and Claim 8 is **DENIED**.

**4.      Age, and Retaliation Claims related to Wilson's Assignment to Tour 2**

USPS next challenges Plaintiff's Claim 5 which alleges that Wilson was discriminated against when Smith required him to move to Tour 2 in July 2012 as either retaliation for his previous protected activity or because of his age.  USPS argues again that Plaintiff fails to establish a *prima facie* case because the move to Tour 2 was not an adverse action and that no similarly situated employees outside of the class were treated more favorably.  Plaintiff argues that the move was essentially a demotion in terms of duties and responsibilities and that Ray Roush was treated differently because he was not given an ultimatum.

An adverse employment action is "a materially adverse change in the terms of her employment." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Although a reassignment without salary or work hour changes is not normally an adverse action, it may be if it "constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), aff'd sub nom. 548 U.S. 53 (2006) (citing *Kocsis* 97 F.3d at 886); *but see Wade v. Automation Pers. Servs.*, Inc., 612 F. App'x 291, 300 (6th Cir. 2015) (shift change by one hour is not materially adverse). Plaintiff argues that the move to Tour 2 was adverse because it was a demotion in terms of duties and responsibilities. Specifically, Plaintiff argues that Tour 2 was the "smallest and most inconsequential Tour at CityGate," and that Wilson's start time meant that he had to come in after Tour 2 had already started and he would have try to catch up. (Doc. 48, Mem. Opp. at 32–33). Plaintiff admits that he had asked to move to Tour 2 before and that such a move was the subject of the previous lawsuit in this Court. As Judge Holschuh determined:

> Finally, Plaintiff has presented evidence to support a finding that Tour II was more desirable than Tour III. Kelley and Wiley both testified that Tour II MDOs have fewer employees to supervise and fewer deadlines to meet. (Kelley Dep. I at 15–19; Wiley Dep. at 19–21; Kelley Decl. ¶ 11). Therefore, according to Plaintiff, being an MDO on Tour II was less stressful than being an MDO on Tour III. Construing the evidence in a light most favorable to Plaintiff, the Court finds that he has established a *prima facie* case of gender discrimination with respect to his removal as Acting MDO on Tour II.

*Wilson v. Potter*, No. 2:07-CV-1118, 2009 WL 1457178, at *8 (S.D. Ohio May 22, 2009) (Holschuh, J.). Plaintiff has not presented any evidence that Tour 2 was a demotion other than his conclusory argument that it was a demotion in terms of duties and responsibilities. Plaintiff cites no deposition testimony, affidavit, or declaration providing evidence that the move to Tour

2 would be a demotion either subjectively or objectively. Even if he had provided subjective evidence, "such 'subjective impression[s] concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Swann v. Time Warner Entm't Co., L.P.*, 126 F. Supp. 3d 973, 983 (S.D. Ohio 2015) (Newman, J.) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004)). Ultimately, Plaintiff admits that he was allowed to keep the differential in pay he received when he moved from Tour 3 to Tour 2 even though Tour 2 employees do not receive differential pay. (Doc. 49-30, Pl.'s Dep. at 52). Plaintiff received more pay than his peers to work in an earlier time slot that he had previously requested on a temporary basis. The Court finds that to the extent any action was adverse to Plaintiff, it was a *de minimis* employment action which is not actionable under Title VII or the ADEA. Accordingly summary judgment as to Plaintiff's Claim 5 is **GRANTED** in favor of USPS.

5. **Race, Age, Gender, and Retaliation Claims Related to the Failure to Promote Plaintiff in December 2013**

USPS also moves for summary judgment as to Plaintiff's claims regarding the re-opening of the Tour 3 Lead MDO EAS 24 position in 2013, identified above as Claim 6. There is no doubt that Plaintiff suffered an adverse employment action when he did not obtain the EAS 24 position in 2013. Instead, USPS argues that for the 2013 denial, both of the comparators outside of the protected classes were treated identically, and that even if Plaintiff can make out a *prima facie* case, that USPS had a legitimate reason for not selecting Plaintiff for the opening. Plaintiff only argues that ultimately DePaul was selected for the position.

First, based on Wilson's argument, there is no doubt that the only comparator cited by Plaintiff who was arguably treated better was also male and thus, there is no *prima facie* case of gender discrimination. Regarding the remainder of the claims, the Court agrees that no other

comparators were treated more favorably because none of the applicants received the position in 2013. Thus, Plaintiff has failed to set forth a *prima facie* case for race or retaliatory discrimination. Accordingly, USPS' Motion for Summary Judgment as to the gender, race, age, and retaliatory discrimination claims regarding the 2013 Lead MDO EAS 24 opening is **GRANTED**.

**6.    Race, Age, and Retaliation Claims Related to Plaintiff's Non-Promotion in 2014**

Finally, in 2014, the Tour 3 Lead MDO EAS 24 position was again posted for competitive selection. On this occasion, Plaintiff was not selected for an interview and the Complaint alleges that he was placed on an unwarranted PIP to prevent him from interviewing for the position. Although USPS again argues that Plaintiff cannot set forth a *prima facie* case based on his non-promotion, there is little actual legal argument to that effect.

As noted above, the *prima facie* case for a failure to promote claim is as follows: (1) he is a member of a protected class; (2) he applied for and was qualified for promotion; (3) he was considered for and denied the promotion; and (4) an individual of similar qualifications outside of the protected class received the job. *Grizzell*, 461 F.3d at 719; *White*, 429 F.3d at 240. Plaintiff is a member of the necessary protected classes who applied for the position. USPS makes no argument that he was not qualified and cannot deny that a younger, white, USPS employee who had not engaged in protected activity was chosen instead. USPS articulates no argument against the *prima facie* case of retaliatory discrimination. Accordingly, the Court finds that Plaintiff has set forth proper *prima facie* cases for race, age, and retaliatory discrimination in connection to the 2014 EAS 24 opening.

However, USPS does provide arguments that it had valid reasons for selecting DePaul over Plaintiff for the open position. Regarding the PIP, USPS argues that Roush issued the PIP not to frustrate Plaintiff's ability to acquire the EAS 24 job, but because of his attitude in

responding to Roush's concerns regarding the holiday schedule.  USPS also argues that DePaul was selected over Plaintiff due to Plaintiff's poor ranking among the applicants for the position, not due to any discriminatory animus or because of the PIP.  USPS notes that DePaul had been on a PIP in his former position but that he was not disqualified from interviewing.  Last, USPS speculates that "[t]he facts underlying the issuance of the PIP are the more likely cause . . . or alternatively, evidence of Plaintiff's short temper and antagonistic personality that may have hindered his quest for promotion at least in this instance."  (Doc. 45, Mot. at 39 (ellipsis in original)).

Plaintiff, however, provides evidence that the stated reasons are merely pretext for discrimination.  He notes that he was significantly more qualified than DePaul for the open position (Doc. 49-32, V. Roush Dep. at Ex. 2, PAGEID# 1649–654, 1679–686); that DePaul had been rejected for a similar job at least twice while in Cincinnati (Doc. 49-34, DePaul Dep. at 27–28); that Smith failed to appoint a review committee in violation of USPS policy (Doc. 49-37, USPS Policies at 743.52, PAGEID# 2031 ("When 5 or more applications are received, the selecting official with the vacancy must designate a review committee of at least 3 members")); that to the extent Mrs. Roush and Craft constituted a review committee, Wilson violated USPS policy by having too few members and members who were supervisors of the position to be filled (*Id.* at § 743.523(a) ("Neither the supervisor of the position to be filled nor any manager exercising authority over the supervisor, up to and including the selecting official, may serve on the review committee or participate in its deliberations")); that Wilson had been previously interviewed for the position (Doc. 49-32, V. Roush Dep. at 37); that Mrs. Roush put Plaintiff on a PIP (*Id.* at Ex. 7, PAGEID# 1759); and finally, that Smith tried to remove Plaintiff from his Lead MDO position prior to the job reopening  (Doc. 49-30, Wilson Dep. at 137).   USPS

responds to none of these arguments and does not even mention the 2014 position job opening in its reply brief.  The Court agrees with Plaintiff that taking all of the above allegations together, a reasonable jury could find that Plaintiff was discriminated against on the basis of his race, his age, or his protected activity.   Accordingly, summary judgment as to Claims 6 and 7 is **DENIED**.

## IV.   CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.  Plaintiff's retaliation, age, and race discrimination claims for all of the following remain outstanding: Claims 2 and 3 regarding his level of pay while performing Lead MDO duties and the failure to post the EAS 24 position in 2009; Claim 4 regarding USPS' refusal to promote Plaintiff to the Tour 3 Lead MDO position or Senior MDO position; and Claim 7 regarding the failure to promote Plaintiff in January 2014.  Also outstanding are the gender discrimination claims for the Lead MDO position in Claims 3 and 4, and the gender discrimination claim constituting Claim 8 concerning the RIF Avoidance procedures.

The Clerk shall **REMOVE** Document 45 from the Court's pending motions list. Previously, the parties were unable to mediate this case due to the pending motion which is now resolved.  Thus, the parties shall contact Magistrate Judge Jolson to arrange for participation in an upcoming Settlement Week or schedule a Mediation/Settlement Conference outside of a designated Settlement Week.

**IT IS SO ORDERED.**

      */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**